**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| OLANDER RAYMOND RICHARDSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19cv352 |
| | ) | |
| SGT. TAYLOR and | ) | |
| OFFICER HOPKINS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on the "Motion for Summary Judgment" (Docket Entry 34) (the "Summary Judgment Motion") filed by "Sgt. Gregory Taylor and Officer Taylor Hopkins" (collectively, the "Defendants") (id. at 1).[1] For the reasons that follow, the Court should deny the Summary Judgment Motion.

## BACKGROUND

Alleging that Defendants "violated [his] eight[h-]amendment" rights "by using excessive force" (Docket Entry 2 (the "Complaint") at 4), Olander Raymond Richardson (the "Plaintiff"), now a federal prisoner (see id. at 2, 4), initiated this action pursuant to 42 U.S.C. § 1983 against Defendants in their individual and official capacities (see id. at 2-3), for their alleged actions on the night

---

[1] Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination. For legibility reasons, this Opinion uses standardized spelling and capitalization in all quotations from the parties' materials.

of April 11, 2017, at the Alamance County Jail (see id. at 5-6). According to the (unverified) Complaint:

On April 11, 2017, something "went on inside [the] S Block" of the Alamance County Jail, prompting officers to "lock [the inmates] down." (Id. at 12.) At that time, Plaintiff "was on the phone so [he] and Sgt. Taylor had some words[: Sgt. Taylor] told [Plaintiff] to pack [his] stuff[. Plaintiff] told [Sgt. Taylor] to pack it[.]" (Id.) Sgt. Taylor then entered Plaintiff's cell and began to throw Plaintiff's "mail and food on the top tier well top level of the Block[,] so [Plaintiff began] telling [Sgt. Taylor] that he had no reasons to throw [Plaintiff's] personal stuff." (Id. at 12-13.)

Sgt. Taylor "then beg[a]n to force [Plaintiff] down the stairs[,] grabbing [Plaintiff] in an unprofessional way[. As] soon [as they] got outside of [the] S Block[, Plaintiff] pull[ed his] arm[. Sgt. Taylor] then beg[a]n to throw punches." (Id. at 13.) "[B]eing in defense mode[, Plaintiff] start[ed] to block [his] face[.] Officer Hopkins c[a]me to [Plaintiff's] right side and began to help punch [Plaintiff]." (Id.) "[T]hey g[o]t [Plaintiff] to the ground and cuff[ed Plaintiff] and Officer Taylor [sic] [as] well [as] Sgt. Taylor began to hit [Plaintiff] with the stick they use to hit the buttons in the block to keep up with the rounds[.]" (Id.) "[Plaintiff] just saw blood all over the floor[.]" (Id.)

2

These latter events occurred "outside of [the] S block facing Q block in between all the block[s] on the new side of the jail." (Id. at 12.) As such, "Jimmy Downny from Q Block saw it[,] Atonio Griffen[,] Desmond Maccaire, Josh Gaint, on that night all blocks didn't lock down because they saw [Plaintiff] getting beat while handcuffed so street officers w[ere] called[.]" (Id. at 13.)[2] "[Plaintiff] was t[aken] to medical by Officer Allen" (id.), who "was present but never cause[d] no [sic] harm" (id. at 12). "Justice Paul[,] a female[,] she said what happen[ed] to you[? Plaintiff] told her." (Id. at 13; see also id. ("[I]f [Plaintiff] was a problem[,] why wasn't [he] tased[?]").)

As a result of the foregoing, Plaintiff "had a broken nose[, so he] went to Alamance Regional Hospital[ and was] referred to a nose specialist." (Id. at 5.) Plaintiff "went to medical for pain meds[,]" but still experiences headaches and "breathing problems and see[s] speaks [sic] in [his] vision." (Id.) As relief, Plaintiff asks "for [his] medical bills to be paid" and for "$350,000 for [his] pain and suffering." (Id.)

In response, Defendants "move[d] to dismiss the Complaint . . . pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure." (Docket Entry 12 (the "Dismissal Motion") at 1.) Plaintiff opposed the Dismissal Motion, at least as to his

---

2    Plaintiff does not know how to spell the names of those identified in his Complaint. (Id.)

3

individual-capacity claims. (See generally Docket Entry 16
(addressing allegations against Defendants personally without
reference to jail policy).) Finding that "[t]he Complaint
plausibly alleges excessive force claims against Defendants in
their individual, but not official, capacities" (Docket Entry 22 at
19), the undersigned recommended that the Court permit "Plaintiff's
excessive force claims [to] proceed against Defendants in their
individual capacities only" (id.). The Court (per Senior United
States District Judge N. Carlton Tilley, Jr.) adopted that
recommendation, authorizing Plaintiff to proceed on his excessive
force claims against Defendants in their individual capacities.
(See Docket Entry 27 at 1.)

Defendants thereafter filed the Summary Judgment Motion (see
Docket Entry 34), which Plaintiff opposes (see Docket Entries 38,
39). As relevant to the Summary Judgment Motion, the record
reflects the following:

"During the time period encompassed in the Complaint,
[Plaintiff] was a pre-trial detainee [at the Alamance County
Detention Center], awaiting trial on [certain state] charges."
(Docket Entry 34-3, ¶ 2.) "[Plaintiff] had been in the custody of
the Alamance County Detention Center since his arrest by the
Burlington Police Department on September 13, 2016." (Id.)
Officer Taylor Hopkins ("Officer Hopkins") worked for the Alamance
County Sheriff's Office from 2014 to 2018, serving as a Detention

4

Officer at the Alamance County Detention Center.  (Docket Entry 34-1, ¶¶ 1-2.)  Similarly, Sergeant Gregory Taylor ("Sgt. Taylor") worked for the Alamance County Sheriff's Office from 2008 to 2018 (Docket Entry 34-2, ¶ 1), including as a Detention Sergeant at the Alamance County Detention Center (see id., ¶¶ 2, 4).

According to Officer Hopkins:

> On April 11, 2017 at approximately 2200, [he] heard over the radio that Officers needed the medical assistance to respond to S-Block.  [He] understood that an inmate was having a seizure.  Due to this medical emergency, [officers] needed the nurse and EMS but first had to secure the floor.  [Officer Hopkins] went to S-Block to help with locking back the inmates. [Plaintiff] was using the phone and Sergeant Taylor was telling him to get off the phone and to go to his cell.

> [Plaintiff] was reluctant but hung up the phone and proceeded to his cell and cussed Sgt. Taylor the entire way there.  [Officer Hopkins] finished assisting with locking back the bottom of S-Block and hearing [sic] [Plaintiff] yelling.  [Officer Hopkins] then went to his cell (S-13) and witnessed [Plaintiff] refusing to pack his belongings and exit the cell.  [Plaintiff] was given multiple opportunities to pack his belongings and exit the cell but he kept refusing.  [Plaintiff] was given one last opportunity to gather his belongings and exit the cell and he stated, "I ain't going nowhere."

> Sgt. Taylor then grabbed [Plaintiff] and [Officer Hopkins] grabbed his other arm and [they] struggled with him to get him out of the cell.  Once out of the cell, [they] proceeded down the steps while [Plaintiff] was resisting the whole way trying to jerk away from Sgt. Taylor and [Officer Hopkins].  Once [they] exited the block, [Plaintiff] jerked away from Sgt. Taylor and [Officer Hopkins] and swung and hit Sgt. Taylor in the face.  [Officer Hopkins] then hit [Plaintiff] in the face with a closed fist and grabbed his leg and took him to the ground along with Sgt. Taylor and Officer Allison.

> Once on the ground, [Plaintiff] kept resisting and finally stopped.  [Officer Hopkins] got [Plaintiff's]

5

left arm behind him and cuffed while Officer Allison
cuffed his right arm. [Plaintiff] was then escorted to
medical by Officers Allison and Sexton.

At this point, multiple officers from Graham PD and
Deputies had arrived and assisted [them] with locking
back the rest of the new jail. Sgt. Taylor and [Officer
Hopkins] were then taken to Alamance Regional Medical
Center by Cpt. Young for blood exposure.

[Plaintiff] was transported to Alamance Regional
Medical Center for treatment for a broken nose.

[Officer Hopkins] only struck [Plaintiff] to protect
Officer [sic] Taylor from injury.

(Docket Entry 34-1, ¶¶ 4-10 (internal paragraph numbering
omitted).)

In turn, Sgt. Taylor avers:

[On April 11, 2017, Sgt. Taylor] responded to a medical
emergency on S-Block. When [he] arrived, several inmates
directed [him] upstairs to cell number 12 where, upon
entering, [he] saw Officer Sexton assisting Inmate
Douglas Hackler who was having a seizure. [Sgt. Taylor]
e[xi]ted the cell and began directing officers arriving
on scene to lock the entire block so medical staff could
have access.

[Sgt. Taylor] believe[s that he] noticed three (3)
inmates who were still using the phones. [He] informed
them that they needed to end their calls due to the
medical emergency. Two (2) of the inmates ended their
calls. [Plaintiff] remained on the phone ignoring the
orders [that Sgt. Taylor] was giving him. [Sgt. Taylor]
ordered [Plaintiff] to end the call or [Sgt. Taylor]
would hang up the phone. [Plaintiff] finally ended his
call but then began to curse at [Sgt. Taylor] and raise
his voice stating, "You ain't have to disrespect me," and
"I ain't gotta do shit, I just got fifteen (15) years!"
[Sgt. Taylor] explained that when Officers gave orders,
inmates are expected to follow them. [Plaintiff] again
cursed and argued with [Sgt. Taylor]. [Sgt. Taylor] then
told [Plaintiff] that when [they] arrived at his cell, he
needed to pack his belongings because he was being moved
to the old jail for failure to follow orders.

6

[Plaintiff] then stated, "I ain't packing shit!" [Sgt. Taylor] again ordered him to pack his belongings. He stated again that he was not packing.

At this point, [Sgt. Taylor] entered [Plaintiff's] cell, S #13, and due to the medical emergency, grabbed his bin, mat and linens and began tossing them out of the cell to hurry along the moving process. [Sgt. Taylor] then ordered [Plaintiff] twice to gather his belongings and exit the cell, but he refused stating, "I ain't going nowhere." [Sgt. Taylor] then grabbed [Plaintiff] by the back of his shirt, with both hands and began to direct him out of the cell. Officer Taylor Hopkins assisted [Sgt. Taylor] with directing [Plaintiff] out of his cell.

[Plaintiff] resisted and tried to jerk away from both of [them]. He was then placed against the railing on the upper catwalk and guided down the stairs towards the exit by Officer Hopkins, Officer Allison, and [Sgt. Taylor]. The entire way down the stairs and out of S-Block, [Plaintiff] attempted to pull away from [them]. When [they] finally exited S-Block and were heading towards the hallway, [Plaintiff] was able to pull away from being restrained.

After [Plaintiff] was able to pull away, he immediately turned around and struck [Sgt. Taylor] once or twice in the face with his fist. At that time, Officer Hopkins struck [Plaintiff] with his fist. [Plaintiff] still attempted to fight, and [Sgt. Taylor] began striking [Plaintiff] in his head and face with [Sgt. Taylor's] f[is]ts to prevent any injury to any officers. After striking [Plaintiff] several times, [Sgt. Taylor] was told by Officer Hopkins that [Plaintiff] was under control and Officer Allison and [Officer Hopkins] were able to place handcuffs on [Plaintiff] at that time. Officer Sexton arrived sometime during the fight and assisted with getting [Plaintiff] into handcuffs.

When [Plaintiff] was finally under control, [Sgt. Taylor] noticed that [Plaintiff] was bleeding heavily from around his nose. [Plaintiff] was escorted to medical by Officers Allison and Sexton. [Sgt. Taylor] then noticed that all of the inmates in the other blocks were beating on the windows and yelling. [Sgt. Taylor] had officers who responded begin to lock the entire West Jail down. At that time, [Sgt. Taylor] then went to the

booking area to ·speak with Lt. Young about the situation and inform him that [they] needed more officers to assist with locking back.

[Sgt. Taylor] returned to the floor to assist in any capacity [that he] could with the medical emergency. EMS arrived and transported Inmate Hackler to [the hospital]. CSI and detectives arrived and photographed the scene. [Plaintiff] was also transported to [the hospital] to be treated for his injuries. Captain Young escorted Officer Hopkins and [Sgt. Taylor] to [the hospital] to be treated for blood exposure. Officer Hopkins and [Sgt. Taylor] returned from [the hospital] at approximately 0300 as did [Plaintiff]. [Plaintiff] was escorted by medical and then placed in I-Block cell #6. All officers returned to their posts without further incident.

Extreme caution was advised when dealing with [Plaintiff]. He continued to show extreme hostility to detention staff while housed at Alamance County Detention Center.

(Docket Entry 34-2, ¶¶ 4-11 (internal paragraph numbering omitted).)

For his part, Plaintiff submitted statements under penalty of perjury in opposition to both the Dismissal Motion and the Summary Judgment Motion. (See Docket Entry 18 (the "Declaration"); Docket Entry 39 (the "Affidavit").) As relevant here, the Declaration states:

On April 11, 2017, [Plaintiff] was on the phone inside of the housing unit when the unit officer announced a lock down. [Plaintiff] saw [Sgt.] Taylor approaching so [Plaintiff] asked him for the reason why [their] housing unit was being placed on lock down — [Plaintiff] asked him this because [Plaintiff] wanted to let [his] family (on the phone) . . . know what was going on. However, [Sgt.] Taylor immediately told [Plaintiff] to pack [his] belongings. [Plaintiff] advised him that [Plaintiff] did not do anything wrong, but [Plaintiff] hung up the phone and instantly proceeded to [his] cell to pack [his] things. When [Plaintiff] arrived at [his]

8

cell, [Sgt.] Taylor was there, throwing [Plaintiff's] property out of the door. He then started shoving [Plaintiff] down the stairs. [Plaintiff] explained to him that [Plaintiff's] leg was hurting from the way he was shoving [Plaintiff;] however, he kept on shoving [Plaintiff]. At one point[, Plaintiff] felt as if [he] was going to fall so [he] pulled [his] arms out of [Sgt. Taylor's] grip in order to brace [him]self, but that is when [Sgt.] Taylor began to hit [Plaintiff] with a metal stick that he held in his hand while [Officer] Hopkins placed [Plaintiff] in handcuffs.

After being placed in handcuffs — and posed no threat to either [of the] defendants — [Sgt.] Taylor continued beating [Plaintiff] with the metal stick, and [Officer] Hopkins began to strike [Plaintiff] with his closed fist.

As a result, [Plaintiff's] nose was broken and [he] was taken to an outside hospital where [his] nose was put back in place by a specialist.

(Docket Entry 18, ¶¶ 4-6 (internal paragraph numbering omitted); see also id., ¶ 8 ("Contrary to [Defendants'] claim, [Plaintiff] complied with [Sgt.] Taylor's order to pack [his] belongings. [Plaintiff] did not break any prison rules, and [he] was beaten even after [he] was placed in handcuffs.").)

Plaintiff gave this account of the incident in his Affidavit:

[Plaintiff] was being housed that the Alamance County Detention [Center] beginning date of [September 2016] for state cases and federal case.

On April 11[,] 2017[,] some type of emergency had taken place, within S[-B]lock. Sgt. Taylor and [Plaintiff] had some words about inmates still being on the phone. So [Plaintiff] stated, you don't have to come off like that disrespectful, but [he] still went to [his] cell[. Plaintiff] said a few words and [Sgt. Taylor] said pack your stuff[, and Plaintiff] said you pack it. [Sgt. Taylor] then went inside [Plaintiff's] cell and start[ed] slinging [Plaintiff's] personal belongings [and] then grab[bed Plaintiff] and was pulling

[Plaintiff] down the staircase[. Plaintiff] was telling
[Sgt. Taylor that Plaintiff] ha[d] been shot in [his]
right leg[, but Sgt. Taylor was] still pulling with anger
so when [they] exit[ed] S Block[, Plaintiff] pulled [his]
arm back [because] of the pain[. Sgt. Taylor] then start
throwing punches and [Plaintiff] look[ed] to [his] side
and seen [sic] Officer Hopkins hitting [Plaintiff]
also[,] so [Plaintiff] fell to the ground[.] Officer
Sexton was there[. Plaintiff] was in handcuffs and Sgt.
Taylor beat [Plaintiff] with the stick [Sgt. Taylor did]
rounds with[. B]lood was all over [Plaintiff] and the
floor[. A]ll this took place in the bubble outside S.
Block[.] All the other inmates was hitting the glass.
So the video should show [Plaintiff] leaving the block
which [was] S Block and you seen [sic] inmates refusing
to lock down due to how the officers was beating
[Plaintiff] outside the block. Help had to come lock the
block down all because the officers was using excessive
force.

        The incident on April 11, 2017[,] took place at the
new jail inside and outside S-Block. Incident got out of
hand in the sally port or you can say the Bubble.
[Plaintiff] was sent to [the] hospital for [a] broken
nose. And pain medicine was given [and he] had to see
[a] special doctor after that.

        [Plaintiff] ha[s] a few witness[es] who w[ere]
housed also in other blocks. [T]he Bubble window can see
all the area.

        Today [Plaintiff is] still having headaches and
ha[s] trauma. [He] thought officers are to protect and
serve.

(Docket Entry 39, ¶¶ 1-5 (internal paragraph numbering omitted).)

        Defendants also submitted two video clips "depicting part of

the events" (Docket Entry 35 at 6). (See Docket Entry 36 at 1;

Docket Entry 34-3, ¶ 4.) The video clips reflect surveillance

footage of Plaintiff's cellblock on the night in question. (See

generally "Young Aff. Exhibit A - Video" (the "Cellblock Video");

10

"Young Aff. Exhibit B - Video" (the "Upstairs Video").)[3]   The
cellblock comprises a large rectangular room two stories high (see,
e.g., Cellblock Video at 21:44:00), with a wall of windows on one
end (see, e.g., Upstairs Video at 21:46:00).   From the vantage
point of the surveillance camera on that wall of windows,[4] the area
closest to the windows contains two metal tables.  (See Cellblock
Video at 21:44:00.)  Slightly to the right and a few steps beyond
the tables into the cellblock, four back-to-back telephones appear
on a post beneath the landing area of a second-floor catwalk, from
which a stairwell descends into the lower level of the cellblock,
facing away from the surveillance camera.  (See id.)  On the left
wall, a few feet past a television and roughly even with the
telephones, appear a window and glass door, the apparent exit for
the cellblock.  (See, e.g., id. at 21:48:05.)  A few feet past the
exit door begins the left portion of the second-floor catwalk,
which runs the remainder of the left wall, along the back wall, and
up the right wall, in a lopsided U-shape.  (See id.)  A second

_____

    3    The Cellblock Video provides footage from one vantage
point, but the Upstairs Video contains footage from four different
vantage points above the catwalk in the cellblock.  (See id.)  The
Cellblock Video lasts approximately 15.5 minutes, from 21:44:00 to
21:59:33, and the Upstairs Video lasts approximately 9 minutes,
from 21:46:00 to 21:54:59.  (See id.)  The videos neither contain
audio nor show activity in areas other than the S-Block and
portions of nearby hallways.  (See id.)

    4  The descriptions in this Opinion maintain that perspective,
even when describing events in the Upstairs Video, which provides
the opposite perspective.

staircase, facing the surveillance camera, descends from the catwalk near the back left corner (see id.), a few feet from Plaintiff's cell (see Upstairs Video at 21:51:39 to 21:51:45). Inmate cells line both the upper and lower portion of the room for most of the catwalk. (See, e.g., id. at 21:50:37.)

When the videos commence, groups of inmates in orange-and-white stripped uniforms sit around the metal tables, playing dominos or watching television, while four individuals talk on the telephones and other individuals mill around both the upper and lower portions of the cellblock. (See, e.g., Cellblock Video at 21:44:00 to 21:47:53; Upstairs Video at 21:46:00 to 21:48:10.) An officer approaches the cellblock door, stands outside it for a few seconds, and then enters after an inmate turns to face the door and starts pointing up the stairwell that extends from the back catwalk. (See Cellblock Video at 21:47:46 to 21:48:07.) Leaving the cellblock door open, the officer follows another inmate up the stairs and enters a cell on the left side of the catwalk. (See id. at 21:48:07 to 21:48:17; see also Upstairs Video at 21:48:04 to 21:48:19.)

Inmates continue moving freely around the cellblock, even as two officers followed shortly thereafter by a medical official enter the cellblock and proceed directly up the stairs to the cell that the initial officer entered. (See Cellblock Video at 21:48:17 to 21:49:33; see also Upstairs Video at 21:48:19 to 21:49:34.)

12

Sgt. Taylor, the second officer in this group (see Cellblock Video at 21:48:17 to 21:51:00), looks in that cell, but does not enter; instead he opens Plaintiff's cell door as he talks on his radio and then walks around on the catwalk, opening a second cell door before stopping occasionally to look down over the railing (upon which he drums his hands) and to gesture. (See Upstairs Video at 21:49:22 to 21:50:24.) Meanwhile, additional officers enter the cellblock and inmates begin gathering up their dominos and walking around the cellblock, with some entering their cells. (See Cellblock Video at 21:49:25 to 21:50:37; Upstairs Video at 21:49:25 to 21:50:21.) Sgt. Taylor, in turn, starts down the back stairs and heads towards the area of the cellblock containing the telephones, closing a cell door on the right wall near the telephones before approaching the inmates using the telephones. (See Cellblock Video at 21:50:20 to 21:50:45; Upstairs Video at 21:50:23 to 21:50:41.) The inmates hang up their telephones, with the final inmate other than Plaintiff hanging up his telephone approximately six seconds before Plaintiff hangs up. (See Cellblock Video at 21:50:35 to 21:51:10.)

While occasionally looking backwards and/or, at the top of the stair landing, turning to talk with or gesture towards the closely following Sgt. Taylor, Plaintiff then walks to his cell. (See id. at 21:51:08 to 21:51:53; see also Upstairs Video at 21:51:09 to 21:51:47.) As Plaintiff (and immediately thereafter) Sgt. Taylor enter Plaintiff's cell, inmates remain outside their cells on the

13

lower floor, but the last inmate enters his cell upstairs between the time that Plaintiff hangs up his telephone and reaches the stairs. (See Cellblock Video at 21:51:08 to 21:51:53; Upstairs Video at 21:51:09 to 21:51:47.) Additional officers gather on the catwalk outside Plaintiff's cell before Sgt. Taylor throws a blue bin out of Plaintiff's cell, followed a few seconds later by Plaintiff's linens. (See Upstairs Video at 21:51:47 to 21:52:30.) Shortly after Sgt. Taylor throws Plaintiff's linens on the catwalk, Officer Hopkins enters Plaintiff's cell. (See id. at 21:52:30 to 21:52:39.)[5]

Within seconds, Sgt. Taylor and Officer Hopkins, holding the back of Plaintiff's shirt and his arm, push Plaintiff out of his cell and into the catwalk railing, where Sgt. Taylor adjusts his hold so that he grabs both the back of Plaintiff's shirt and his right arm, while Officer Hopkins maintains a similar hold with Plaintiff's left arm. (See id. at 21:52:48 to 21:52:54.) Defendants, followed closely by a third officer, move Plaintiff to the nearby stairs, briefly pressing him against the railing at the side of the stairs before the group moves back into the middle of the stairwell and quickly proceeds down to the cellblock floor. (See id. at 21:52:53 to 21:53:06; see also Cellblock Video at 21:52:48 to 21:53:07.) This group then exits the cellblock door,

_____

5  During these events, two of the officers leave the area outside Plaintiff's cell and converse with the medical official in the adjoining cell. (See id. at 21:52:23 to 21:52:49.)

with Officer Hopkins holding onto Plaintiff's left arm and Sgt. Taylor holding Plaintiff's right arm, which Plaintiff extends in front of him as they move through the cellblock door and turn to the left, out of range of the surveillance cameras; Plaintiff does not wear handcuffs as he exits the cellblock.  (<u>See</u> Cellblock Video at 21:53:05 to 21:53:12; Upstairs Video at 21:53:06 to 21:53:12.)

Immediately thereafter, an officer's leg, in a bracing stance facing towards the direction of the cellblock exit, appears in the hallway outside the wall of windows.  (<u>See</u> Upstairs Video at 21:53:23.)  The catwalk outside Plaintiff's cell obscures the view of activity in that portion of the hallway, but the video shows one officer walking away down a hallway perpendicular to the wall of windows as another officer runs up the hallway parallel to the wall of windows towards the area where the officer's leg appeared.  (<u>See</u> <u>id.</u> at 21:53:23 to 21:53:55.)  During this activity, two officers exit the cell of the ill inmate in the S-Block; one runs down the stairs and out of the cellblock while the other officer returns to the inmate's cell.  (<u>See</u> <u>id.</u> at 21:53:38 to 21:53:49.)  Shortly, another officer walks up the hallway parallel to the wall of windows, followed a few seconds later by an inmate in a solid orange uniform.  (<u>See</u> <u>id.</u> at 21:53:49 to 21:54:11.)  Seconds later, another officer hurries up the hallway parallel to the wall of windows towards the group gathered at the edge of the wall of

15

windows obscured by the catwalk outside Plaintiff's cell. (See id. at 21:54:11 to 21:54:24.)

Less than a half-minute thereafter, two officers begin escorting Plaintiff down the hallway parallel to the wall of windows, trailed by a few more officers. (See id. at 21:54:24 to 21:54:58.) Due to distance between the camera and figures, the video does not show whether Plaintiff wears handcuffs at this point. (See id.) During these events, an inmate exits the cell of the ill inmate and periodically watches the activity in the hallway from the catwalk in the S-Block. (See id. at 21:53:30 to 21:54:55.) Subsequently, officers occasionally enter and leave the cellblock, and the inmate remains on the catwalk, but no additional medical personnel appear before the videos end. (See Cellblock Video at 21:54:55 to 21:59:33.) The officers in the videos all wear the same uniform, with no indication that any work for outside agencies. (See generally Cellblock Video; Upstairs Video.)

Defendants also submitted a picture of the stick that they use to log rounds. (See Docket Entry 34-3, ¶ 5.) Made primarily of a hard blue plastic, the stick appears roughly three times as wide, three times as thick, and 1.28 times as long as a Bic Pilot pen. (See Docket Entry 34-6 at 1.) The top of the stick appears made of a thick metal with holes drilled into it and the bottom of the stick appears made of a solid metal end cap. (See id.)

16

## DISCUSSION

## I. Relevant Standards

## A. Summary Judgment

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists

17

and summary judgment is improper." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996). Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

Moreover, "where affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie." *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016) (internal quotation marks omitted). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also, e.g.*, *Love v. Beasley*, 788 F. App'x 935, 937 (4th Cir. 2020) (concluding, on review of summary judgment decision, "that the district court did not err in finding that [a defendant] did not punch [the plaintiff] as alleged, because video of the incident confirms [the defendant's] denial"). Notably, though, in *Scott*,

> the [United States] Supreme Court was faced with a videotape of the incident in question that "utterly discredited" the plaintiff's account, rendering it a "visible fiction." 550 U.S. at 380–81. As between a videotape of undisputed authenticity, *id.* at 378, and the plaintiff's story, the Court held, the videotape should prevail. Where the nonmoving plaintiff's account is "blatantly contradicted by the record" so that "no reasonable jury could believe it," it should not be

18

adopted by a court ruling on a motion for summary judgment. *Id.* at 380.

> As [the United States Court of Appeals for the Fourth Circuit] ha[s] clarified, *Scott* is the exception, not the rule. It does not "abrogate the proper summary judgment analysis, which in qualified immunity cases 'usually means adopting . . . the plaintiff's version of the facts.'" *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott*, 550 U.S. at 378). That standard continues to apply in the face of "documentary evidence" that lends support to a government official's account of events, *id.*, or even makes it "unlikely" that the plaintiff's account is true, *United States v. Hughes*, 606 F.3d 311, 319–20 (6th Cir. 2010) (holding that *Scott* does not apply to photographs rendering plaintiff's account "unlikely"). Summary judgment is proper under *Scott* only when there is evidence — like the videotape in *Scott* itself — of undisputed authenticity that shows some material element of the plaintiff's account to be "blatantly and demonstrably false." *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3d Cir. 2007) (refusing to extend *Scott* to evidence in form of police photographs that fail to depict "all of the defendant's conduct and all of the necessary context"); *see also Witt*, 633 F.3d at 277 (holding *Scott* inapplicable to soundless video that does not capture key disputed facts).

Harris v. Pittman, 927 F.3d 266, 275–76 (4th Cir. 2019) (parallel citations omitted), cert. denied, 140 S. Ct. 1550 (2020).

## B. Excessive Force Standards

Both pretrial detainees and convicted prisoners possess constitutional protections against an officer's use of excessive force: a convicted prisoner under the Cruel and Unusual Punishment Clause of the Eighth Amendment and a pretrial detainee under the Due Process Clause of the Fourteenth Amendment. See Kingsley v. Hendrickson, 576 U.S. 389, 400 (2015); see also, e.g., Graham v. Connor, 490 U.S. 386, 395 n.10 (1989) (explaining that, "[a]fter

19

conviction, the Eighth Amendment serves as the primary source of substantive protection in cases where the deliberate use of force is challenged as excessive and unjustified," but that, "[i]t is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment" (internal quotation marks and ellipses omitted)). "The language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" Kingsley, 576 U.S. at 400. Accordingly, to succeed on an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Id. at 396–97.

The Supreme Court identified certain considerations that "may bear on the reasonableness or unreasonableness of the force used," namely:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id. at 397. Courts must assess objective reasonableness "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. In addition, courts must account for the

20

government's legitimate interests in managing the facility, "appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." Id. (internal quotation marks and brackets omitted).

Further, in assessing objective reasonableness, a court should view the use of force "in full context, with an eye toward the proportionality of the force in light of all the circumstances." Smith v. Ray, 781 F.3d 95, 101-02 (4th Cir. 2015) (internal quotation marks omitted) (explaining that Fourth Circuit has rejected defense "argu[ment] that [it] should take a 'segmented view of the sequence of events' and hold that each step taken by the officer was reasonable based on [the plaintiff's] immediately preceding actions"). Nevertheless, "[i]n considering the reasonableness of an officer's actions, [the court] must consider the facts at the moment that the challenged force was employed." Id. at 101. Notably, "the reasonableness of force employed can turn on a change of circumstances during an encounter lasting only a few seconds." Harris, 927 F.3d at 274. In this regard, the Fourth Circuit "ha[s] made clear that the justification for using protective force expires at the very moment a threat is neutralized." Dean v. Jones, 984 F.3d 295, 305 (4th Cir. 2021) (explaining that, "[o]nce [the plaintiff] was subdued and [the defendant officer] no longer had reason to fear for officer or

21

public safety, the use of force became unnecessary and unjustified — even if all of that transpired merely seconds after [the plaintiff] head-butted [the defendant officer]"); see also, e.g., Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005) ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated.").

## II. Analysis

Defendants move for summary judgment, asserting that "Plaintiff's contentions do not preclude the entry of summary judgment in Defendants['] favor" and that "the force utilized against Plaintiff was objectively reasonable." (Docket Entry 35 at 8, 9 (bold font and underlining omitted).) In so arguing, Defendants rely on the notion that they ceased using force against Plaintiff when he stopped resisting them (see id. at 8-11), an assertion that Plaintiff disputes (see, e.g., Docket Entry 18, ¶¶ 4-5, 8; Docket Entry 39, ¶ 2). Given the record, Defendants' contentions cannot justify summary judgment.

First, Defendants contend that the video evidence "disproves some of Plaintiffs' key contentions. Those contentions are that he was repeatedly struck while cuffed, that he was beaten with the sticks officers use to log rounds, and that he went to retrieve his belongings from his cell right away." (Docket Entry 35 at 9.) This argument largely centers around the theory that Plaintiff

22

claimed that Defendants beat and handcuffed him while on the stairs in the S-Block.  (See, e.g., id. at 10-11 ("The video does not show either Defendant hitting Plaintiff with a metal stick, nor placing him in handcuffs on the stairs after he grabbed the railing.").)  However, Plaintiff repeatedly stated, and Defendants agree, that he pulled away from Sgt. Taylor and the officers handcuffed him outside the S-Block.  (Docket Entry 34-1, ¶¶ 6-7; Docket Entry 34-2, ¶¶ 7-8; Docket Entry 39, ¶ 2; see Docket Entry 2 at 12-13.)  Accordingly, the fact that the videos of the S-Block fail to show any handcuffing or beating of Plaintiff does not (as a matter of law) defeat his excessive force claims.

As to the final contention, Defendants argue that "video shows that Plaintiff did not immediately proceed to his cell as he claims, nor was an officer already in the cell tossing his property out, contradictory to Plaintiff's claims."  (Docket Entry 35 at 10.)  The videos reflect that, after hanging up the telephone, Plaintiff walked to his cell, albeit while engaged in an exchange with Sgt. Taylor, with only 40 seconds or so elapsing between the time Plaintiff hung up the telephone (downstairs) and entered his cell (upstairs).  (See Cellblock Video at 21:50:35 to 21:51:50; Upstairs Video at 21:51:09 to 21:51:47.)  As such, the videos do not (as a matter of law) contradict Plaintiff's assertion that he proceeded directly to his cell after hanging up the telephone, but do (as a matter of law) contradict Plaintiff's Declaration to the

23

extent that it suggests that Sgt. Taylor threw Plaintiff's property out of his cell prior to or upon Plaintiff's arrival at his cell (see Docket Entry 18, ¶ 4 ("When [Plaintiff] arrived at his cell, [Sgt.] Taylor was there, throwing [Plaintiff's] property out of the door.")).

Nevertheless, Plaintiff's false statement on that point does not (as a matter of law) foreclose Plaintiff's excessive force claims. See Harris, 927 F.3d at 275-78 (analyzing evidence regarding excessive force incident and concluding that it failed to blatantly contradict plaintiff's "crucial contention[s]" and "critical assertion[s]" regarding "the crux of [his] § 1983 action" under Scott, precluding summary judgment for defendant); see also Love, 788 F. App'x at 937 (finding, in case involving fight between plaintiff Love and officer Beasley and allegations of officers Young's and McCourt's subsequent retaliatory assault against Love, summary judgment on excessive force claim against Young and McCourt improper based on Young's, McCourt's, and Love's conflicting affidavits even though video disproved Love's assertion that Beasley had punched him while restrained, thus warranting summary judgment for Beasley). In sum, Defendants' video-based contentions do not entitle them to summary judgment. See Harris, 927 F.3d at 276 ("Summary judgment is proper under Scott only when there is evidence — like the videotape in Scott itself — of undisputed

24

authenticity that shows some material element of the plaintiff's account to be 'blatantly and demonstrably false.'").

Next, Defendants maintain that they used objectively reasonable force against Plaintiff. (See Docket Entry 35 at 8-9.) In this regard, they assert, in full:[6]

> In the case at hand, Officers Taylor and Hopkins were confronted with a medical emergency consisting of a seizure suffered by an inmate. In order to provide the needed medical treatment for that inmate, staff needed to lock down the cell block. ([Docket Entry 34-2,] ¶ 4; [Docket Entry 34-1,] ¶ 4). The officers had to ensure medical treatment was afforded to the ill inmate, and to do so, they had to secure the pod for the safety of medical personnel. Of the inmates in the pod, all complied, except Plaintiff. Plaintiff refused to hang up the phone, and refused to gather his belongings, forcing Sgt. Taylor to do so. ([Docket Entry 34-2,] ¶ 5). As officers escorted Plaintiff out of the pod, Plaintiff resisted and punched Taylor in the face. ([Docket Entry 34-2,] ¶ 8). Thereafter, officers used force to subdue him but stopped when Plaintiff did. ([Docket Entry 34-2,] ¶ 8). Plaintiff was promptly given medical treatment.
>
> When applying Kingsley to the case at hand, it demonstrates the objective need for force and the appropriateness of same in the following manner:
>
> 1) Officers were facing a medical emergency.
>
> 2) Plaintiff refused to hang up the phone and to gather his belongings, further delaying the ability of medical personnel to enter the pod.
>
> 3) As he was being escorted from the pod, Plaintiff resisted and broke free, striking Taylor in the face.

---

6 Defendants did not file a reply in support of their Summary Judgment Motion. (See Docket Entries dated July 19, 2021, to present.)

25

> 4) Officers used force to subdue Plaintiff and
> stopped when Plaintiff ceased being combative.
>
> Defendants had to use force to obtain vital medical
> treatment and legitimate [sic] interest of the facility.
> Plaintiff constantly resisted and punched Defendant
> Taylor in the face ([Docket Entry 34-2,] ¶ 8; [Docket
> Entry 34-1,] ¶ 6). Thereafter both officers struck
> Plaintiff with closed fists. Plaintiff did suffer a
> broken nose and received prompt medical treatment for
> same ([Docket Entry 34-2,] ¶¶ 9, 10; [Docket Entry 34-1,]
> ¶¶ 7, 9).
>
> Defendants respectfully submit that they utilized
> only the force that was objectively reasonable and that
> they are entitled to judgment in their favor as a matter
> of law.

(Docket Entry 35 at 8-9.)

As a preliminary matter, Defendants' arguments regarding the necessity of locking down the S-Block and moving Plaintiff from his cell misapprehend Plaintiff's excessive force claims, which focus on his contention that Defendants beat him after handcuffing him. (See, e.g., Docket Entry 2 at 7 (identifying issue as beating by two officers), 12 (asserting that officers violated Plaintiff's constitutional rights by causing bodily harm and that injury occurred outside S Block), 13 (asserting that other blocks refused to "lock down because they saw [Plaintiff] getting beat while handcuffed"); Docket Entry 16 at 1-3 (emphasizing repeatedly allegation of beating while handcuffed and discussing law regarding beating of handcuffed inmates); Docket Entry 18 at 1-2 (emphasizing repeatedly allegation of beating while handcuffed); Docket Entry 38 at 2 (asserting that "[D]efendants willfully exceeded their

26

authority while [P]laintiff was in restraints handcuffed and shackled in the sallyport of the jail that was secluded intentionally by the prison officials where there was no camera footage to be taken of the incident"), 3 (contending "[t]hat the officers involved wilfully exceeded their authority and intentionally utilized the cover of the badge to elicit irreparable harm to [P]laintiff who was subdued in handcuffs the entire time of the bloody incident and bloody beating he suffered by the indifferent [D]efendants").) Accordingly, Defendants' arguments regarding the appropriateness of locking down the S-Block and moving Plaintiff from his cell do not warrant summary judgment under the <u>Kingsley</u> analysis. <u>See, e.g.</u>, <u>Smith</u>, 781 F.3d at 101 ("In considering the reasonableness of an officer's actions, [the court] must consider the facts at the moment that the challenged force was employed.").

As relevant to Plaintiff's claims, the record, construed in the light most favorable to Plaintiff as the nonmoving party, reflects the following:

Sgt. Taylor and Officer Hopkins forced Plaintiff, a pretrial detainee, out of the cell and against the catwalk railing, gripping him by the back of his shirt and arms. (<u>See, e.g.</u>, Upstairs Video at 21:51:44 to 21:52:53; Docket Entry 18, ¶ 4; Docket Entry 34-3, ¶ 2; Docket Entry 39, ¶ 2.) Sgt. Taylor and Officer Hopkins, followed by a third officer, pushed Plaintiff against the stairwell

railing one time as they rapidly descended the stairwell. (See Upstairs Video at 21:52:53 to 21:53:06; see also, e.g., Cellblock Video at 21:52:48 to 21:53:07; Docket Entry 18, ¶ 4 (asserting that Sgt. Taylor shoved Plaintiff down stairwell).) During this descent, Plaintiff explained that Sgt. Taylor's actions hurt Plaintiff's leg (due to an old gunshot injury), but Sgt. Taylor continued to push Plaintiff (see Docket Entry 18, ¶ 4; Docket Entry 39, ¶ 2), who attempted to pull away from Defendants (see Docket Entry 34-1, ¶ 6; Docket Entry 34-2, ¶ 7). Due to the pain and feeling that he might fall, Plaintiff pulled his arm from Sgt. Taylor's grasp after they exited the S-Block. (See Docket Entry 18, ¶ 4; Docket Entry 34-1, ¶ 6; Docket Entry 34-2, ¶ 7; Docket Entry 39, ¶ 2.)

When Plaintiff pulled his arm away, Sgt. Taylor started punching him and Officer Hopkins started hitting him, so he fell to the ground. (Docket Entry 39, ¶ 2.) Defendants assert that before officers "took [Plaintiff] to the ground," Plaintiff "swung and hit Sgt. Taylor in the face," causing Officer Hopkins to punch Plaintiff in the face. (Docket Entry 34-1, ¶ 6; see also Docket Entry 34-2, ¶ 8.)[7] Sgt. Taylor also struck Plaintiff "several

---

7    Particularly given Plaintiff's averment that he "did not break any prison rules" (Docket Entry 18, ¶ 8), the Court arguably should not accept at this juncture Defendants' assertions regarding Plaintiff punching Sgt. Taylor. Regardless, as explained in the discussion that follows above, the alleged punch does not impact the outcome of the Summary Judgment Motion.

times" in his head and face.  (Docket Entry 34-2, ¶ 8; see also Docket Entry 39, ¶ 2.)  Plaintiff stopped resisting and Officer Hopkins informed Sgt. Taylor that Plaintiff "was under control" prior to officers handcuffing Plaintiff. (Docket Entry 34-2, ¶ 8; see also Docket Entry 34-1, ¶ 7.)  However, Sgt. Taylor began hitting Plaintiff with a metal stick while Officer Hopkins handcuffed him.  (Docket Entry 18, ¶ 4.)  Sgt. Taylor and Officer Hopkins continued hitting Plaintiff after officers handcuffed him. (Docket Entry 18, ¶ 5; Docket Entry 39, ¶ 2.)  Defendants broke Plaintiff's nose, causing it to bleed profusely.  (See Docket Entry 18, ¶¶ 4-6; Docket Entry 34-2, ¶ 9; Docket Entry 39, ¶ 2.) Officers escorted Plaintiff to the jail's medical facilities before sending him to the local hospital.  (See Docket Entry 18, ¶ 6; Docket Entry 34-1, ¶¶ 7-9; Docket Entry 34-2, ¶¶ 9-10; Docket Entry 39, ¶ 3.)  Plaintiff's nose required a specialist to repair and he still experiences headaches and trauma from the incident. (Docket Entry 18, ¶ 6; Docket Entry 39, ¶ 5.)

Viewing the foregoing evidence in the light most favorable to Plaintiff (as the Court must at this point), Plaintiff had ceased all resistence and submitted to handcuffing when Sgt. Taylor and Officer Hopkins hit him with the stick and their fists, resulting in significant injury.  Such facts "tend to show that the amount of force used was disproportionate to the need for force."  Iko v. Shreve, 535 F.3d 225, 240 (4th Cir. 2008); see also Dean, 984 F.3d

at 305 ("[The Fourth Circuit] ha[s] made clear that the justification for using protective force expires at the very moment a threat is neutralized."). Accordingly, the first <u>Kingsley</u> factor, the relationship between the need for the use of force and the amount of force used, weighs in Plaintiff's favor.

The second <u>Kingsley</u> factor, the extent of the plaintiff's injury, also weighs in Plaintiff's favor. A broken nose, particularly one that requires a specialist's attention, "is an objectively serious injury," <u>Brown v. Albemarle Cnty. Police Dep't</u>, No. 7:14-cv-576, 2015 WL 5178193, at *3 (W.D. Va. Sept. 4, 2015) (discussing broken wrist). The third <u>Kingsley</u> factor, any effort made by the officer to temper or limit the amount of force used, likewise supports Plaintiff, as (in the light most favorable to Plaintiff) the record does not indicate that Defendants attempted to limit the force that they used against Plaintiff, particularly after handcuffing him. <u>See</u> <u>Perdue v. Harrison</u>, No. 1:17cv403, 2017 WL 4804363, at *5 (M.D.N.C. Oct. 24, 2017) (finding third <u>Kingsley</u> factor favored plaintiff where complaint alleged that defendant choked and hit him while restrained).

The remaining factors, "the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting," <u>Kingsley</u>, 576 U.S. at 397, also favor Plaintiff. On Defendants' own evidence, Plaintiff ceased his resistence and "was under control" prior to

officers handcuffing him. See <u>Thompson v. Commonwealth of Va.</u>, 878 F.3d 89, 105 (4th Cir. 2017) ("The use of force must stop when the need for it to maintain or restore discipline no longer exists." (internal quotation marks omitted)). The fact that Plaintiff had previously pulled away from Defendants and, allegedly, punched Sgt. Taylor cannot justify the striking of Plaintiff after he ceased resisting and officers placed him in handcuffs. See <u>Dean</u>, 984 F.3d at 305-06; <u>Waterman</u>, 393 F.3d at 481.

Under these circumstances, a reasonable fact-finder could determine that Defendants' use of force lacked objective reasonableness. As a result, the Court should deny the Summary Judgment Motion.

<u>**CONCLUSION**</u>

Material factual disputes exist regarding whether Defendants used excessive force.

**IT IS THEREFORE RECOMMENDED** that the Summary Judgment Motion (Docket Entry 34) be denied.

This 6th day of January, 2022.

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**
